# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 08 CR 669 |
| | ) | |
| v. | ) | Judge David H. Coar |
| | ) | |
| CHRISTOPHER WEST, *et al.*, | ) | Magistrate Judge |
| | ) | Martin C. Ashman |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Before this Court is the Motion to Dismiss and Request for Evidentiary Hearing filed by Defendants Tahir Ramin, John Ramin ("the Ramins"), and AZ Corporation ("AZ Corp.") (collectively, "the Defendants"). The Defendants have been indicted on various charges of conspiracy to commit bribery under 18 U.S.C. § 371, conspiracy to commit mail fraud under 18 U.S.C. § 1349, and the bribery of public officials under 18 U.S.C. § 201 related to acts allegedly undertaken at Bagram Air Force Base in Afghanistan. The Defendants seek to dismiss the charges in the indictment against them on the ground that the United States of America ("the Government") intimidated a witness from appearing at a deposition, thereby violating their Sixth Amendment right to call a witness in their defense. For the reasons stated below, the Court finds that the Defendants' Motion should be denied.

## I. Background

John Ramin and Tahir Ramin were the principal officers and majority shareholders of AZ Corp., with John serving as president and Tahir as vice-president. On February 16, 2010, the Court granted the Ramins leave to depose four witnesses in Kabul, Afghanistan pursuant to Fed. R. Crim. P. 15. One of these witnesses was an Afghan man named Gul Padshah. The Court allowed the depositions to go forward in Afghanistan, in large part, because Padshah and the other deponents were very reluctant to travel to the United States to testify either in a deposition or at trial. As the Court has explained in earlier orders, the Defendants' witnesses were concerned for their safety because the Government had previously lured several witnesses to the United States and detained them here for over a year. Padshah's distrust of the United States was so pronounced that he declined to travel even if the Government provided him with a letter stating that he would not be arrested or detained if he chose to testify as a witness in this country.[1] (Def's. Mot., Ex. 1 at 4.)

The events leading up to the instant Motion began in Afghanistan in March, 2010 when Gregory Shilling ("Shilling"), a Special Agent of the Army Criminal Investigation Division in Kabul, received information about John Ramin. According to Shilling, an informant notified him that Ramin had offered money to a man known as Pacha Kahn if Kahn would falsify certain (unspecified) documents for Ramin. (Pltf's. Resp., Ex. 2 at ¶ 3.) As events turned out, "Pacha Kahn" was in reality the Defendants' witness Gul Padshah, although Shilling states in an unsworn

---

[1] After several procedural delays, the depositions allowed by the Court's February 16 Order took place in September, 2010 in Afghanistan. The parties have not indicated whether or not Gul Padshah appeared as a witness. The Court assumes that he did not, as the Government would likely have moved to deny the instant Motion as moot if Padshah had testified.

affidavit that he was unaware of this fact.² Shilling's informant told him that the individual identified to him as Kahn had rejected Ramin's offer, was willing to speak with Shilling, and expected Shilling to call him. (*Id.* at ¶¶ 3-4.) Accordingly, Shilling decided to contact Padshah to ask him questions as a potential witness for the Government.

The parties differ on exactly what took place between Shilling and Padshah. According to Shilling, he was given a phone number for Padshah and first called him on June 3. (*Id.*) Padshah, however, spoke little or no English, and Shilling was unable to communicate with him effectively. As a result, Shilling called Padshah again several hours later, this time using the services of a translator who worked with the Government and had a top secret security clearance. (*Id.* at ¶ 5.) Shilling claims that during the second call he identified himself to Padshah and invited him to Camp Phoenix, Afghanistan in order to ask Padshah questions as a potential Government witness against the Defendants. According to Shilling, Padshah expressed no concerns about being detained, and Shilling reiterated that Padshah's compliance was entirely voluntary. (*Id.* at ¶ 6.) Addressing Padshah only under the name of Pacha Kahn, Shilling states that he reassured Padshah that he would not be detained, and Padshah eventually agreed to come to Camp Phoenix on June 8 for an interview. (*Id.* at ¶ 7.) Padshah, however, did not show up at the appointed time, and Shilling states that he had no further contact with him after their June 3 phone conversation.³ (*Id.* at ¶ 9.)

---

² For the sake of clarity the Court refers to Kahn/Padshah as Padshah unless otherwise noted.

³ The Defendants note that the phone log of Shilling's calls, discussed below, indicates that Shilling reached Padshah again on June 8. The Government explains Shilling's oversight in failing to note the June 8 call on the ground that he prepared his unsworn affidavit while en route
(continued...)

The Defendants agree that Shilling made two phone calls to Padshah on June 3.[4] Their version of what Shilling stated, however, is significantly different from the Government's account. According to Christopher Pratt, an investigator hired by the Ramins in Afghanistan, Padshah called him on June 5 to report that an American had called Padshah twice on June 3 and "instructed" him to go to Camp Phoenix to sign his "previous contract" with the Government. (Def's. Mot., Ex. 2 at ¶¶ 5-6.) Pratt states that Padshah sounded "extremely distressed" and "fearful" during their conversation and was anxious that the Government would harm him if he failed to appear as instructed. (*Id.* at ¶ 7.) Pratt told Padshah that it was his choice to appear or not, and their conversation came to an end. (*Id.*) The June 5 phone call was Pratt's last conversation with Padshah, whom Pratt has been unable to reach by phone or through relatives. (*Id.* at ¶¶ 8-9.) As the Government notes, Shilling had a brief second conversation with Padhsah

---

[3](...continued)
from Virginia to Kabul, Afghanistan. (Pltf's. Sur-Reply at 3.) Contrary to the Defendants' argument, the Government duly noted Shilling's June 8 call in its Response. (Pltf's. Resp. at 3, n.1.)

[4] The Defendants attached a document to their Reply that purports to be a log of calls made from Shilling's cell phone to Padshah, (Def's. Reply at Ex. 1.), and the Court expressed serious concern at the hearing from a security standpoint as to how the Defendants were able to obtain such records for an Army Special Agent working on classified matters at a military base in Afghanistan. The Defendants represented that the records were obtained from an Afghan cellular company that issued the cell phone to Shilling. Defendants subsequently supplied a Certification of Business Records by Eng Wali Sultani, the Director of Government Relations of Afghan-Wireless. The Court assumes that Afghan-Wireless is the company in Afghanistan that issued a cell phone to Shilling, although the Defendants do not explicitly state this as a fact. Nevertheless, the Certification states that the document submitted by the Defendants contains an accurate log of calls made from Shilling's phone account, that the records were made near the time of the events they represent, and that they are kept in the regular course of business. (Def's. Certification of Business Records.) The Court still has a security concern about the phone records but must assume that the Government has effectively investigated and dealt with the issue.

on June 8, but Padshah has apparently disappeared altogether since that time. (Pltf's. Resp. at 3, n.1.)

## II. **Legal Standard**

The Sixth Amendment provides that a criminal defendant "shall enjoy the right . . . to have compulsory process for obtaining witnesses in his favor." U.S. Const. amend. VI. This guarantee to present the defendant's own version of the facts involves a fundamental element of due process of law. *Washington v. Texas*, 388 U.S. 14, 19 (1967); *United States v. Hooks*, 848 F.2d 785, 799 (7th Cir. 1988). This right can be violated, however, if a defense witness is prevented from testifying due to governmental interference such as intimidation or threat. *See United States v. George*, 363 F.3d 666, 671 (7th Cir. 2004). "[I]t is not necessary to prove that a witness was actually intimidated by the threats, but only that the threats had a reasonable tendency to intimidate." *United States v. DeStefano*, 476 F.2d 324, 330 (7th Cir. 1973). As the Seventh Circuit has explained, courts analyze witness intimidation claims under an objective standard designed to guarantee that only "true threats" are punished. *United States v. England*, 507 F.3d 581, 589 (7th Cir. 2007) (internal quote and citation omitted).

## III. **Discussion**

Before assessing the merits of the Motion, the Court must first address the nature of the evidence on which the Defendants and the Government rely. Both sides have submitted written statements that present problems related to their execution and the possible hearsay nature of their content. Neither side has fully addressed these issues, however, and the Court does not

undertake a complete hearsay analysis in the absence of such arguments. Instead, it discusses, without deciding, the general evidentiary problems posed in this case in order to determine the most appropriate means of assessing the evidence in light of the unusual facts presented here.

### A. The Parties' Evidence

The Defendants rely primarily on an unsworn declaration by investigator Pratt in which he verifies that his statements are made "under penalty of perjury." Two evidentiary concerns arise from this declaration. Pratt states that he currently lives in Afghanistan, and the declaration was presumably made in that country. By statute, an unsworn declaration carries the same evidentiary weight as a sworn statement only if it complies with the perjury provisions of 28 U.S.C. § 1746. Section 1746 carefully distinguishes between perjury statements that must be included in declarations made inside the United States and statements mandatory for declarations made elsewhere. *See* 28 U.S.C. § 1746. When, as here, an unsworn declaration is made outside the country, the declarant must state: "I declare . . . under penalty of perjury *under the laws of the United States of America* that the foregoing is true and correct." 28 U.S.C. § 1746(1) (emphasis added). Pratt's declaration omits this emphasized language and, strictly speaking, does not comply with the statute's requirements. The omission need not be fatal, however, because courts do not always demand full compliance with the statute's requirements. *See Trapaga v. Central States Joint Bd. Local 10*, No. 05 C 5742, 2007 WL 1017855, at *4-5 (N.D. Ill. March 30, 2007) (finding partial compliance with the statute to be sufficient). Pratt's declaration satisfies § 1746(2)'s requirement for statements made inside the United States, and the Court accepts the declaration as substantially compliant with § 1746(1)'s language for extra-territorial declarations.

The more troubling issue here is the declaration's potentially hearsay nature. Hearsay is an out of court statement "offered in evidence to prove the truth of the matter asserted." Fed. R. Evid. 801(c). Pratt's declaration presents two different levels of testimony that may be hearsay, depending on the Defendants' purpose for offering these statements: (1) what Padshah told Pratt on June 5 concerning Padshah's anxieties, and (2) what Padshah told Pratt that Shilling said in the June 3 call. Pratt's declaration on what Padshah told him about Padshah's own feelings are clearly submitted to show that Padshah was afraid, and these out of court statements constitute hearsay evidence. As statements made of Padshah's existing state of mind, however, they may be admissible under the hearsay exception provided in Fed. R. Evid. 803(3). Whether the second layer of testimony – Pratt's declaration on what Padshah told him on June 5 that Shilling had said to Padshah on June 3 – constitutes double hearsay is less certain. It is not entirely clear from the briefs in this case if the Defendants are submitting Pratt's declaration to show the truth value of what Shilling allegedly said or only to demonstrate the effect Shilling's words had on Padshah. If the latter is true, Shilling's statements may not be hearsay evidence because out of court statements offered to show context, such as the effect of the words on a listener, are not considered hearsay. *See United States v. Bailey*, 270 F.3d 83, 87 (1st Cir. 2001) (citing 5 Weinstein's Federal Evidence § 801.03[4] (2d ed. 1999)); *see also United States v. Linwood*, 142 F.3d 418, 425 (7th Cir. 1998) ("[N]ot every potentially hearsay statement is inadmissible, for there will often be a non-hearsay use for it.") (emphasis omitted). For the reasons noted below, the Court need not resolve this issue in order to decide the Defendants' Motion.

The Government's submission of Special Agent Shilling's purported affidavit presents a different set of problems. "An affidavit is a statement reduced to writing and the truth of which is sworn to before someone who is authorized to administer an oath." *Pfeil v. Rogers*, 757 F.2d 850, 859 (7th Cir. 1985) (internal quote and citation omitted). Shilling's statement was not sworn before a notary and, as a result, is not a proper affidavit. Unlike Pratt's declaration, moreover, it also fails to state that it was made under penalty of perjury and does not comply with either of the two perjury requirements under 28 U.S.C. § 1746. As a result, Shilling's statement cannot be considered a valid unsworn declaration.

During the hearing, however, the Court directed the Government to provide some verification that Shilling's conversation with Padshah was properly translated. The Government has subsequently submitted a declaration by the top secret Dari linguist who translated Shilling's June 3 conversation with Padshah. The translator states that he accurately translated Shilling's comments into Dari and confirms Shilling's declaration that Shilling did not use a ruse to lure Padshah to Camp Phoenix, did not threaten him, and specifically told Padshah that his compliance was voluntary. (Notice of Declaration of U.S. Government Linguist at 1-2.) While the linguist's statements as to what Shilling said may implicate the hearsay rule, the declaration contains other important evidence that does not. The linguist states: "I interpreted a telephone conversation between Agent Shilling and an individual named Pacha Kahn. I faithfully and accurately interpreted the words Agent Shilling spoke in Dari, and faithfully and accurately interpreted the words Kahn spoke into English." This testimony relates to the linguist's own acts and perceptions concerning "Pacha Kahn" as the person Shilling spoke with on June 3 and is not hearsay.

Unfortunately, the translator's declaration also presents additional evidentiary issues. As with Pratt's declaration, the linguist's statement fails to include the required perjury language of 28 U.S.C. § 1746(1) for a declaration made outside the United States, but the Court accepts the statement for the same reasons stated above in regard to Pratt. More importantly, the declaration does not identify the linguist by name and is submitted under the pseudonym "Doc." The Government contends that revealing the translator's identity would place him and his family in significant danger because he works with the Government in Afghanistan in highly sensitive functions. The Court finds this argument well-founded. "Doc" works in an active and unstable war zone, and earlier proceedings have made clear that serious security issues exist in this case. Pseudonyms can be used when a witness's safety must be maintained. *See United States v. Abu Marzook*, 412 F. Supp.2d 913, 923-24 (N.D. Ill. 2006); *see also United States v. Cavallaro*, 553 F.2d 300, 304 (2d Cir. 1977). In light of the fact that "Doc"'s testimony does not directly relate to the charges in the indictment itself, the Court accepts his declaration for the limited purpose of resolving the Defendants' Motion.

As a result, the declarations of Pratt and "Doc" are the primary evidence in this matter, although each poses potential hearsay issues. In lieu of undertaking a full hearsay analysis, the Court believes that the circumstances of this case warrant some flexibility. The declarations have been obtained in a war zone thousands of miles away, and all the principal witnesses – Padshah, Pratt, Shilling, and "Doc" – are missing, unavailable, or difficult to produce. Courts can relax the rules of hearsay under some circumstances. *See Steele v. Taylor*, 684 F.2d 1193, 1200 (6th Cir. 1982) ("[C]ourts are willing to relax the hearsay rule somewhat in order to insure a decision based on the relevant facts, depending on the reason for the witness's unavailability[.]"). For the

sake of argument, therefore, the Court assumes the case most favorable to the Defendants and considers the Pratt declaration in its entirety, adding only that non-hearsay portion of "Doc"'s declaration that confirms Shilling's testimony that he spoke with a person named Pacha Kahn, not Gul Padshah. After all, all three declarations present out of court statements that are potentially hearsay in nature, and their purpose at this stage is not to prove anything other than whether an evidentiary hearing should be held in this matter.

### B. The Witness Intimidation Issue

The Seventh Circuit has stressed that courts must use an objective standard when evaluating whether statements that form the basis of an intimidation claim constitute "true threats." *See Edwards*, 507 F.3d at 589 ("This standard governs the contents of the threat; that is, whether the defendant's statement is actually an expression of intention to inflict evil, injury, or damage.") (internal quote and citation omitted). Not all statements that appear threatening are sufficient to support a finding of witness intimidation. A "true threat" is a statement made "in a context or under such circumstances wherein a reasonable person would foresee that the statement would be interpreted by those to whom the maker communicates a statement" as a threat. *Id.* (quoting and adopting the standard stated in a different context by *United States v. Stewart*, 411 F.3d 825, 828 (7th Cir. 2005)).

The Defendants contend that their compulsory process rights were violated when Shilling allegedly called Padshah on June 3 and instructed him to appear at Camp Phoenix to sign a contract Padshah had with the Government. According to the Defendants, Shilling's actions constitute "a transparent ruse" to lure Padshah to Camp Phoenix. (Def's. Mot. at 9.) Avoiding

Seventh Circuit authorities and relying primarily on *United States v. Golding*, 168 F.3d 700 (4th Cir. 1999) and *United States v. MacCloskey*, 682 F.2d 468 (4th Cir. 1982), the Defendants argue that Shilling's acts constitute an abuse of governmental power designed to intimidate Padshah into not testifying for them.

The cases the Defendants cite illustrate the meaning of the objective standard for intimidation because both involved direct threats of prosecution designed to intimidate a potential defense witness from testifying at trial. In *Golding*, a federal prosecutor threatened a defense witness with prosecution in order to prevent her from testifying and then called attention to the witness's failure to testify in order to strengthen the Government's case in the closing argument. *Golding*, 168 F.3d at 703-04. In *MacCloskey*, prosecutors told the defendant's attorneys that charges would be dropped prior to trial against his co-conspirator, who was also potentially the defendant's primary witness. Shortly after trial began, however, the prosecutor warned the witness's counsel that she could be re-indicted if she incriminated herself during testimony and advised her to invoke her Fifth Amendment rights. *MacCloskey*, 682 F.2d at 475-76.

The Defendants' reliance on these cases is misplaced because they are premised on acts considerably more egregious than the events presented here. In both *Golding* and *MacCloskey*, the prosecutors had the ability to intimidate – and intentionally used it – by virtue of their governmental power as prosecutors. *See Hooks*, 848 F.2d at 799 (stating that a prosecutor violates a defendant's compulsory process right when he "intends to use his authority to distort the judicial fact-finding process.") By contrast, Pratt states only that Shilling, who is not a prosecutor, invited Padshah to Camp Phoenix to sign a contract. The Defendants have not shown

how Shilling had any control or influence over Padshah, officially or unofficially, or why a call from an unknown American official with whom Padshah appears to have had no previous dealings is objectively threatening. Indeed, the Defendants do not contend in their Motion that Shilling's words posed an objective threat to Padshah.

Instead, they essentially rely on subjective factors to argue that it was foreseeable that Padshah would be intimidated because he knew what had become of other Afghan citizens who were detained in this country as potential witnesses. The Government was aware that all the Defendants' deponents were afraid, the Defendants contend, and thus it was foreseeable that Shilling's June 3 call would intimidate Padshah.[5] Under this argument, Padshah would presumably have interpreted any unwanted contact with a United States official as an implicit threat. Padshah's alleged predisposition to fear is not, in itself, sufficient to show that Shilling's words were so intimidating that he violated the Defendants' compulsory process rights; as *Edwards* states, the standard "does not provide a yardstick for measuring the likelihood that the statement would . . . subjectively affect the intended recipient." *Edwards*, 507 F.3d at 589-90. Rather, the standard measures whether a reasonable person would foresee that his comments would be intimidating to the recipient. *Stewart*, 411 F.3d at 828. The relevant issue, therefore, is whether Shilling could have reasonably foreseen that his call to Padshah would have been interpreted as a threat.

---

[5] The exact nature of the Defendants' foreseeability argument is not entirely clear. The Defendants contend that Shilling's purpose was to induce Padshah to come to Camp Phoenix to "peek at the substance of [his] testimony" for the Defendants. (Def's. Mot. at 10.) If this is the case, the Government could not have foreseen that Padshah would flee. Indeed, Shilling's June 3 call would have ensured the Government would never get hold of Padshah or his testimony for the Defendants if it were foreseeable that Padshah would flee.

In order to foresee the effect of his words, of course, Shilling would have to know more than that Padshah was already distrustful of the Government. He also had to intend to talk with the Defendants' actual witness, Gul Padshah, not someone he believed to be "Pacha Kahn." Competent evidence shows that is not the case here. As noted above, the Court accepts "Doc"'s confirmation of Shilling's testimony that he addressed Padshah only as Pacha Kahn during the conversation. (Declaration of U.S. Gov't. Linguist ¶ 2.) Even if Shilling knew that the Defendants' deposition witnesses were afraid of the Government, and even if he made the comments Pratt alleges, he could not have foreseen that Padshah would be intimidated if Shilling believed him to be someone else altogether. Moreover, Shilling's words would not have been threatening even if Shilling only pretended to believe the person he spoke with was "Pacha Kahn," knowing all along it was Gul Padshah. To constitute an implied threat, Padshah would have had to be aware of Shilling's strategy, and Pratt's declaration provides no ground for inferring such a conclusion.

The Defendants argue that Shilling's belief that Kahn and Padshah were different people is incredible because "Pacha Kahn" is a nickname meaning "wealthy king." (Def's. Reply at 2.) The Defendants assert this, however, only "upon information and belief" because "anyone familiar with the language" would know that Pacha Kahn is merely another name for Padshah. (*Id.* at 2-3.) If true, it would presumably not be difficult to present an affidavit or declaration to that effect, but the Defendants have not submitted any evidence to support their contention that "Pacha Kahn" and "Gul Padshah" are so closely associated in Pashto, Dari, or any other language that Shilling should have known that Kahn was Gul Padshah.

Instead, the Defendants direct the Court's attention to page 2 of the Personal Data Report for an alleged Afghan warlord, Mr. Enayatullah. (Def's. Reply at Ex. 2.) That page contains an "aliases" section that, in Mr. Enayatulluh's Report, is blank. The Defendants appear to argue that a similar Report would have existed for Gul Padshah, that Shilling would not have invited Padshah to Camp Phoenix without running the Report, and that the Report would have contained the name "Pacha Kahn" in the "aliases" section. The Defendants, however, have not submitted any evidence supporting a claim that a Personal Data Report existed for Padshah. Moreover, this argument is circular in nature in that it assumes that Pacha Kahn is, in fact, a nickname for Padshah that would have been included on the Report.

In the absence of evidence supporting their claim, the Defendants have not shown that Shilling had any reason to believe that he was speaking with Gul Padshah or that the words attributed to Shilling in the Pratt declaration constitute an objective threat that denied the Defendants their right to present Padshah as a witness. As the Court has discussed, an evidentiary hearing is not required because, even if all three declarations submitted in this matter are taken as true, Shilling's actions still do not constitute intimidation that would, under the law, reasonably cause a witness to flee.

## IV. Conclusion

Based on the nature of the evidence submitted in this matter, combined with the difficulty in obtaining witnesses who are missing or unavailable, the Court finds that the evidentiary

-14-

hearing requested by the Defendants is not required. For the foregoing reasons, the Defendants' Motion to Dismiss and Request for Evidentiary Hearing (Dckt. # 572) is denied.

**ENTER ORDER:**

_____
**MARTIN C. ASHMAN**
United States Magistrate Judge

**Dated:** October 4, 2010.