**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No. 08-CR-669 |
| | ) | Judge Matthew F. Kennelly |
| | ) | |
| CHRISTOPHER WEST, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**MOTION IN LIMINE BY THE UNITED STATES TO PRECLUDE
EVIDENCE OR ARGUMENT RELATED TO A DURESS DEFENSE**

The United States of America, by and through its undersigned attorneys, hereby moves this Court pursuant to Rules 104, 401, and 402 of the Federal Rules of Evidence, to preclude defendants from asserting a purported defense of duress or coercion by examining witnesses, adducing evidence, or tendering argument that they were somehow forced into making the illegal bribe payments in this case such that they cannot be held responsible. This proposed defense would apparently concede that the defendants paid bribes to corrupt military officials, but posits that they did so under duress. As discussed below, however, defendants cannot establish that they had either a reasonable fear of imminent and impending death or serious bodily injury or that they lacked any legal alternative to violating the law, and therefore, defendants cannot, as a matter of law, pursue a defense of duress. In particular, there is no evidence that these defendants made any attempt to inform law enforcement of such coercion or took any steps to simply absent themselves from the environment they now claim held them under duress. To the contrary, when interviewed on several occasions by law enforcement, these defendants made no mention that they were paying bribes or that they feared for their lives. Moreover, the evidence

shows that both Ramin defendants traveled freely and prodigiously within Afghanistan and internationally, such that as a matter of law they were not under duress. Indeed, on not one of their international trips did the Ramins report to any U.S. or foreign law enforcement agency that their lives were in jeopardy because of corrupt members of the U.S. military. That in addition to allegedly committing the charged conduct, these defendants made additional illegal payments over the course of several years to numerous other military officials—many of whom have pled guilty in related cases—renders their current protestations of duress all the more frail.

Under similar circumstances, in *United States v. Dunkin*, 438 F.3d 778, 780 (7th Cir. 2006), the Seventh Circuit held that unsupported efforts by a defendant to assert a duress defense—particularly a failure to show no reasonable opportunity to avoid the threatened harm—amount to a form of jury nullification and should be forbidden. Likewise in this case, any attempts to convince the jury that duress excuses this criminal conduct would amount to an impermissible invitation for jury nullification and should be precluded. In connection with this Motion, the United States respectfully requests that the Court hold an evidentiary hearing, as necessary, to determine the sufficiency of defendants' duress defense as a matter of law.

**I        BACKGROUND**

As charged in Counts I-III of the Superseding Indictment, during 2004 and 2005 at Bagram Airfield, Afghanistan ("BAF"), John Ramin and Tahir Ramin conspired to and did, in fact, pay a $30,000 bribe to Christopher West, Patrick Boyd, and Robert Moore in return for the award of a bunkers and barriers contract to Top's, a company controlled by the Ramins. Similarly, as charged in Counts IV-VI and VII-IX of the Superseding Indictment, Noor Alam and NRO and Qudoos Bakshi and NBC, respectively, conspired to and did, in fact, pay a $30,000

bribe for a construction contract at BAF.  In each instance, the contractor defendants paid the $30,000 in cash to one of the military co-conspirators, who then divided the money among them.

Count X and Count XIV of the Superseding Indictment charge the defendants with conspiring to defraud the United States and to commit bribery and mail fraud by inflating the invoiced number of bunkers and barriers delivered to BAF; submitting payment demands based on this inflated number; and receiving payment from the Department of Defense ("DOD") for bunkers and barriers invoiced, but never delivered.  Upon being paid by DOD, the contractor defendants would, in turn, remit a portion of the illegal proceeds back to the West and Moore.  In connection with this bunkers and barriers scheme, Counts XI-XIII charge each contractor defendant, respectively—the Ramins, Top's and AZ; Alam and NRO; and Bakhshi and NBC—with bribery for giving money to West and Moore in return for official acts and in return for their committing and aiding the commission of fraud on the United States.

In conjunction with this case, the Court has accepted the guilty pleas of six individuals involved various criminal schemes at BAF, including Moore, indicted defendants West and Boyd, and unindicted defendants Sergeant Charles Patton, Sergeant Sheryl Ayeni, and Sergeant Wesley Navarro.  A seventh guilty plea, from unindicted defendant Angela West (Major West's wife), is scheduled for December 9, 2010.  In separate cases, the Ramins, AZ, and Sergeants Charles Finch and Gary Canteen have been indicted in the District of Hawaii on bribery and money laundering charges for their roles manipulating the line haul contract at BAF.

At the outset of this matter, the Ramins represented that the "threshold issue of this entire case" is whether the military officials, who have pled guilty to conspiracy and bribery in this matter, forced the contractor defendants into bribery such that the contractors were acting under

3

economic coercion or duress. At a hearing on February 19, 2009, counsel for Tahir Ramin described to Judge Der-Yeghiayan this proposed economic coercion defense.

> It is our defense that these – our clients, the AZ clients, are the victim of an extortion scheme by the military personnel in this case and others at Bagram Air Force Base, that – and the law supports this defense and we can provide the Court with a brief on this – that our clients came to Bagram and were honest hard-working contractors who were perform – the contracts were awarded legitimately and they did their job. And these military officers – some non-commissioned officers, some commissioned officers – they cycle into Afghanistan for 12 or 15 months at a time. They are not people of any meaningful resources here in the states and they see an opportunity to make money. And what they do is they extort clients like ours or else their contracts are terminated, they're not renewed, they blackball them up the chain of command.

Feb. 19, 2009 Hrg. Tr. at 19. This economic duress defense was fundamentally a claim that the defendants should be immune from criminal penalty because if they did not pay bribes to public officials, they would not have received lucrative military contracts.

Holding that this economic duress theory was unrecognized by statute or at common law, Judge Ashman precluded defendants from examining witnesses, adducing evidence, or tendering argument regarding a defense of economic duress or coercion. Doc. 462. Judge Coar declined to decided categorically whether economic duress could ever be a defense to bribery and mail fraud charges. Doc 680, at 11 ("At this point, there is no need to decide the issue. . ."). Judge Coar decided the issue on more narrow grounds, holding that even assuming certain circumstances might allow for a duress defense to bribery and fraud charges, that defendants' proffered evidence in this case was, nevertheless, insufficient. *Id.* at 11 ("If a valid economic duress defense at all exists in this circuit, it would at least require that Defendants act under the threat of losing something to which they felt legally entitled. Defendants have not argued facts consistent with such a scenario."). Judge Coar, therefore, excluded from trial defendants' "proposed

evidence of extortion as a defense to bribery and mail fraud." *Id.* at 2, 4, 7, 12.

Since Judge Ashman's ruling, defendants modified course, now vigorously asserting that they are exploring a physical duress defense, whereby the defendants engaged in the illegal bribery and fraud activity, but did so only under "fear of . . . bodily harm." Doc. 395, at 3. In one iteration, this defense entails an alleged conspiracy among West and others acting in concert with local Afghan warlords, "among them Enayatullah and his brother Khowani, who operated Enayatullah Construction Company ("EHCO")." Doc. 395, at 6-7. Defendants contend that "West and EHCO collaborated to use . . . physical coercion in furtherance of extortion attempts," including one alleged instance where a "representative from EHCO attempted to assassinate John Ramin by shooting" at his car. *Id.* This conspiracy was not merely limited to EHCO, but, the Ramins contend, involved "Afghan warlords [who]. . . acted as enforcers or 'heavies' in helping military officials carry out the extortionate shakedown scheme." *Id.* at 17.

At oral argument before Judge Ashman on May 24, 2010, Tahir Ramin's attorney asserted, "[W]e intend to present evidence that there was a direct connection between the corrupt military officials who were demanding payments from our clients and warlords who operated in the vicinity of the base, who were acting in direct concert as the muscle or the enforcers or part of the expanded criminal organization of these corrupt military officials." When asked about the particulars of such a conspiracy, counsel responded: "Yes, there is a conspiracy, yes, that the corrupt military officials were working in concert with the warlords to make sure that the, that our clients would, or to maximize the chances that our clients would, succumb to the demands of the military officials, the military officials let our clients know the warlords were acting with the military officials. In turn the warlords told our clients, 'We're acting with the military people.'"

5

When asked about the imminent fear of death element, counsel responded: "A 24/7 fear of death, 24-hour and 7-day a week fear of death. These warlords have their own armies. They carry machine guns. They at least once attempted to assassinate one of our clients. They have rocket-propelled grenades. They control large swaths of this country, sometimes as surrogates for the United States government, sometimes not."[1] May 24, 2010, Hrg Tr. at 23.

More recently, counsel expressed that their duress defense was premised on: "[O]ne or more corrupt military officers . . . had a shakedown conspiracy where he used threats of death and violence in order to enforce his demands. And in his discussions he said . . . you better obey me because I am hooked up with the warlords. In tandem, warlords had discussions with one or

---

[1] In the granting the United States's Motion to Preclude the "Warlord Defense" in large part, Doc. 509 at 6-8, Judge Ashman properly acknowledged the possibility that defendants could assert a defense of duress, but only if they could demonstrate the elements thereof. Memorandum Opinion at 7 (Doc. 509) ("Such evidence is relevant only if Defendants can show that the military orchestrated or in some way used or conspired with the warlords to carry out threats or violence on its behalf."); *see also* May 24, 2010, Hrg Tr. at 22-23 ("What [counsel for defendant Tahir Ramin] is saying is he is going to bring evidence that these people, the military people that his client dealt with conspired in some fashion with the locals who are inflicting harm upon people, including people like his client, and that's the reason the payments were made. . . . If he is able to show that, you agree that's relevant."). Those elements include an "imminent threat of death or serious bodily injury" occasioned by the military "using warlords as agents or conduits;" "a well-grounded fear that the threat will be carried out; and no reasonable opportunity to avoid the threatened harm." *United States v. Toney*, 27 F.3d 1245, 1248 (7th Cir. 1994). Judge Coar, likewise, acknowledged that nothing in his Order barring defendants' evidence on economic duress would serve as a bar to their asserting a properly constituted physical duress defense.

The United States makes the instant Motion because it is now clear that the defendants cannot meet the elements of such a defense. Defendants' pursuit of irrelevant discovery and third-party subpoena requests has placed an enormous burden on the federal agencies as they search through millions of records in an attempt to comply, as well as the Court which has expended hours of time hearing oral argument and drafting numerous opinions evaluating defendants' requests. *See*, *e.g.*, Order (Doc. 678). In order to preserve the April 25, 2011, trial date, the United States brings this Motion significantly in advance of trial in an attempt to avoid further unnecessary litigation.

more of our clients and said you had better listen to the military people because we are hooked up with the military people. So that proffer supports a duress defense. . ." Aug. 4, 2010, Hrg Tr. at 44; *see also* July 28, 2010 Hrg Tr. at 19-21 ("[O]ne of these core military officials in this case . . . explicitly threatened violence against civilians and explicitly linked his conspiracy . . . to warlords."). On October 12, 2010, counsel represented that Tahir Ramin could identify *one* such warlord, who was "hooked up with Major West." Tr. at 5 ("Major West told Tahir Ramin you had better listen to me and do my bidding because I am hooked up with the warlords. One of the warlords in turn told Tahir Ramin you better listen to Major West because I, we, the warlords are hooked up with Major West, who is the ringleader of this activity.").

## II    ARGUMENT

"A defense should not be submitted to the jury, even in a criminal case, if there is no credible evidence to support it." *United States v. Dunkin*, 438 F.3d 778, 780 (7th Cir. 2006) (criticizing admission of duress defense when defendant could not as a matter of law show no reasonable opportunity to avoid the threatened harm). "Submission in such circumstances is just an invitation to jury nullification, a practice that is improper." *Id.*

The affirmative defense of duress, while not negating criminal intent, in appropriate cases, may excuse culpability for a criminal act.[2] As the Supreme Court explained, to interpose the defense of duress, the defendant must show that:

> (1) The defendant was under an unlawful and imminent threat of such a nature as to induce a well-grounded apprehension of death or serious bodily injury; (2) the

---

[2] Citing some friction between *Dixon* and *Toney*, Judge Coar has reserved ruling on the proper label of duress as a defense to bribery and mail fraud charges. Doc. 680 at 8, 11. For the purposes of this Motion, the label attached to the defense has no significance; defendants must still meet all the essential elements of the defense, which is a burden they cannot carry.

7

>defendant had not recklessly or negligently placed herself in a situation in which it was probable that she would be forced to perform the criminal conduct; (3) the defendant had no reasonable, legal alternative to violating the law, that is, a chance both to refuse to perform the criminal act and also to avoid the threatened harm; and (4) that a direct causal relationship may be reasonably anticipated between the criminal act and the avoidance of the threatened harm.

*Dixon v. United States*, 548 U.S. 1, 4 n.2 (2006); *United States v. Sawyer,* 558 F.3d 705 711 (7th Cir. 2009); *United States v. Jocic,* 207 F.3d 889, 892 (7th Cir. 2000); 2 W. LaFave, *Substantive Criminal Law* §9.7(b) (2003 & Supp. 2008). When a defendant presenting a duress defense committed an ongoing crime, such as conspiracy, the defendant must have ceased committing the crime as soon as the claimed duress lost its coercive force. *United States v. Bailey*, 444 U.S. 394, 412-13 (1980). Defendants are required to prove the elements of this affirmative defense to the jury by a preponderance of the evidence. *Dixon*, 548 U.S. at 5.

Primary among the requirements in proving duress is that the defendant be under an immediate or impending threat of death or serious bodily injury. The black letter conception of duress is where a person acts at the point of a gun, compelling him to commit a criminal act. *See, e.g.,* Doc. 462 at 11. The bar in establishing an immediate and impending threat is a stringent one, as exemplified by *United States v. Harvey*, where defendant could not assert a duress defense despite the facts that his house had been shot at twice, he had been shot at, his brother's store had been firebombed, and plans were made to threaten his sister along with her daughter. 516 F.3d 553, 555 (7th Cir. 2008).

Generalized or speculative fear of death or serious bodily injury is insufficient. *Sawyer*, 558 F.3d at 711 (holding duress only applicable if someone was "present at all times" "forcing [defendant] to act under constant compulsion"). As the Seventh Circuit has articulated, a threat

8

that consists of "a generalized fear of attack by some unknown or unspecified assailant at some unknown time in the future" does not suffice as duress. *United States v. Tokash*, 282 F.3d 962, 966 (7th Cir. 2002); *United States v. Sahakian*, 453 F.3d 905, 910 (7th Cir. 2006) (holding rumors that DC Blacks, a rival prison gang, had targeted for death the leader of the Aryan Brotherhood was a "generalized future threat" insufficient as a matter of law to support a duress defense); *Sawyer*, 94 F.3d at 712 (holding fear of future violence from drug gang affiliated with a conspirator does not sustain a duress defense); *United States v. Tanner*, 941 F.2d 574, 587 (7th Cir. 1991); *see also United States v. Harper*, 466 F.3d 634, 648 (8th Cir. 2006) (holding fear that sheriff's deputy might sometime in the future harm defendant amounted to "speculative fear" that failed as a matter of law); *United States v. Bastanipour*, 41 F.3d 1178, 1184 (7th Cir. 1994) (holding "contingent and uncertain" threat of execution for apostasy upon deportation to Iran not sufficiently immediate or impending to excuse drug sales). Even in an inherently dangerous and lawless environment, such as a prison, or as relevant here, in Afghanistan, a generalized threat still does not suffice as duress. *Tokash*, 282 F.3d at 970 (noting that "future" and "later" are opposites of "imminent," as required to support a defense of duress).

In addition to demonstrating an immediate and impending fear of death, in order to interpose a duress defense, a defendant must demonstrate that he had no reasonable, legal alternative to violating the law. *Bailey*, 444 U.S. at 412-13. Such reasonable, legal alternatives may include seeking intervention of the authorities or simply leaving the environment. *United States v. Alicea,* 837 F.2d 103, 106-07 (2d Cir. 1988) ("Where there is a reasonable opportunity to escape the threatened harm, the defendant must take reasonable steps to avail himself of that opportunity, whether by flight or by seeking the intervention of the appropriate authorities.").

Foremostly, a reasonable alternative to committing the crime is to notify the police, the district attorney or another proper authority. *Sawyer*, 558 F.3d at 712 (rejecting duress defense where defendant did not contact police in Indiana); *Sahakian*, 453 F.3d at 907 (affirming denial of prisoner defendant's right to introduce a necessity defense where he did not file a grievance with the Bureau of Prisons or pursue other legal alternatives). *Tanner*, 941 F.2d at 576 (rejecting duress defense where prisoner did not seek protective custody or notify guards). The requirement to report the incident exists even if the threat originates from an authority figure. In *Harper*, for example, the defendant claimed that because he was threatened by a police officer he could not turn to law enforcement for assistance. 466 F.3d at 648. The Eight Circuit rejected this argument holding that "nothing prevented Harper from informing [other] law enforcement officials." *Id*; *Colarcurcio*, 659 F.2d at 690 (holding threats from police officers "could have been reported to the Internal Affairs Division . . . , to the district attorney, or to the United States attorney").

It is, moreover, "virtually impossible" that a defendant could not notify the authorities if the criminal activity persists over time. *Sawyer*, 459 F.3d at 712. In *Dunkin*, for example, the Seventh Circuit found that submitting duress to the jury was an invitation to jury nullification because, as a matter of law, there was sufficient time in the one month between two armed robberies (as well as between a first armed robbery in 1998 and the others in 2003) for the defendant to have complained to police or pursued "ample alternatives." 438 F.3d at 780. *See also United States v. Montes*, 602 F.3d 381, 389-90 (5th Cir. 2010) (finding "more than enough time" over the course of two weeks to alert law enforcement about safety concerns); *Sawyer*, 459 F.3d at 712 (holding it virtually impossible that over the course of a year, defendant "never had the chance to contact the police in order to report threats"); *United States v. Liu*, 960 F.2d 449,

455 (9th Cir. 1992) (finding "many reasonable legal alternatives to violating the law over a two-year period," including communicating with or surrendering to federal officials in any city).

Simply leaving the criminal environment is another reasonable alternative to violating the law which defendants must exhaust before interposing a duress defense. In *United States v. Jocic*, 207 F.3d 889, 892-93 (7th Cir. 2000), a get-away driver for a bank robbery could have driven off or "sprinted 55 feet" while the robber was in the bank. Likewise, in *Liu*, the defendant could not support a duress defense where he traveled extensively throughout the criminal conduct, both domestically and abroad, and "could have remained abroad." 960 F.2d at 454-55.

In this case, the evidence demonstrates that the Ramin defendants paid numerous U.S. military officials in varying amounts over the course several years, depending on the nature of the contract or the size of the delivery. They paid not only those U.S. military officials charged in the Superseding Indictment, but others, for contracts ranging from line haul services to vehicles. Far from being under duress from each of these bribe recipients, defendants merely found paying bribes more expedient than competing for contracts. *See Liu*, 960 F.2d at 455 ("[Ting] traveled the crooked path not because he was forced to do so, but because he elected to do so.").

There is no evidence to support the alleged conspiracy among military officials and warlords on which defendants predicate their duress defense. But even assuming such a conspiracy existed, defendants have alleged no imminent threat that caused them to pay bribes continuously over the course of a year or longer. At most they have alleged that defendants had a "24/7 fear of death" because "[t]hese warlords have their own armies, [t]hey carry machine guns, [and t]hey at least once attempted to assassinate one of our clients, [t]hey have rocket- propelled grenades, [and t]hey control large swaths of this country, sometimes as surrogates for the United

11

States government." May 24, 2010, Hrg Tr. at 23. Yet a "24/7 fear of death" is inherently a generalized and speculative fear, which, as the Seventh Circuit has noted, is the opposite of the imminent fear required to assert a duress defense. *Tokash*, 282 F.3d at 970. Afghanistan, like the prison in *Tokash*, is undoubtedly a dangerous place, but the general fear of living and working in such a place does not amount to a legal excuse to committing crime. In fact, defendants now have submitted a list of 47 warlords, identified by only partial names or pseudonyms (including Ali, Ajmal, Azmal, and other extremely common names in Afghanistan), without even asserting that any of the listed "warlords" had presented any threat to defendants. Defendants, like the defendants in *Sahakian* and *Tokash*, at most labored under generalized and speculative fear from unknown individuals.[3] Exh. A. Under these circumstances, defendants do not and cannot assert, as required, that there was some nefarious element "present at all times" "forcing [defendants] to act under constant compulsion." For this reason alone, their defense of duress fails as a matter of law.

Defendants' conception of a duress defense in this case also fails as a matter of law because defendants cannot present evidence that they exhausted all reasonable, legal alternatives rather than engaging in the illegal bribery and fraud activity. Instead, in each instance, defendants

---

[3] This list provided by defendants was ostensibly provided in response to the Court's Order of October 12, 2010, requiring defendants to disclose to the federal agencies "any individual alleged by Defendants to have threatened them with death or bodily injury as a means of enforcing bribes demanded by the U.S. military personnel indicted in this case." Doc. 678 at 3. Despite the Order to provide specific allegations regarding threats presented to defendants as a means of enforcing bribe payments to the U.S. military, however, defendants did not allege that any of the listed individuals threatened them with death or bodily injury or had any relationship with the U.S. military personnel indicted in this case, describing it only as a "list of warlords about whom additional information is required." Exh. A. Defendants did not respond to a follow-up request by the United States, on October 28, 2010, to identify which individuals in particular had subjected them to threats on behalf of the U.S. military. *See* Exh. B.

paid the illegal bribe and in turn received the expected benefit.

Most fundamentally, it is uncontroverted that defendants could have easily removed themselves from any perceived threat. Each night defendants returned to their protected compound in Kabul, away from the U.S. military forces. Throughout this time period, defendants, both U.S. citizens, traveled frequently around the world. *Liu*, 960 F.2d at 454-55 (rejecting duress defense where defendant could have remained in Asia, away from the illegal bribery activity, or sought protection in another city). A review of John Ramin's U.S. passport (which he obtained in 2005) indicates that he traveled into or out of Afghanistan at least 115 times from 2005 to 2008, back and forth to the United States on at least 18 occasions. He held a long term visa for Tajikstan and a residency permit in the Untied Arab Emirates, where entrance stamps indicate he visited on over two dozen occasions from 2005 to 2008. Exh. C. Entrance stamps also indicate travel to Malaysia, Czech Republic, England, Germany, and Turkey. *Id*. A review of Tahir Ramin's U.S. passport, obtained in 2003, shows similarly extensive international travel. Exh. D. At each entry to the United States, defendants could have alerted authorities at the customs and immigration process or any of the law enforcement authorities at the international airport. Defendants also could have alerted any U.S. law enforcement official at any time during their stay. They did not.

Moreover, despite ample opportunity, at no time did any defendant reveal to the authorities that his life or safety was in jeopardy if he did not deliver cash to service members with whom he was doing business on a daily basis, or if he did not wire money to the friends and family of those service members in the United States. Even if the alleged threat emanated from a member of the U.S. military, defendants were required to seek out alternatives, rather than unilaterally acquiesce

to the charged criminal conduct.[4] Even when law enforcement came to them, defendants failed to reveal anything about the threats they now assert. For example, defendant John Ramin was interviewed by Army CID on August 4, 2004, and instead of admitting that he had paid John Mihalczo $15,000 or more for a leased vehicle contract; that he had paid Navarro $20,000 via wire as recently as two weeks before; or that he had already begun paying West and Moore for inflating the numbers of bunkers and barriers received at BAF, he told Army CID that he had only once given $1,500 to a Sergeant Furaha, but never gave money to anyone else. Exh. E. Even when asked specifically about Navarro, John Ramin denied giving him any money. *Id.* During this interview, John Ramin never mentioned warlords of any kind or that he was faced with an imminent and impending fear of death, from military personnel or from warlords.

Defendant Tahir Ramin was interviewed in July 2005, and he denied paying money to West and Moore, though he did assert that West and Moore had approached him to participate in a scheme in which AZ would be paid for bunkers and barriers not delivered to BAF. Exh. F. He did not mention warlords or being faced with any threat of death or bodily injury by anyone. *Id*. Even when interviewed in the United States incident to his arrest, Tahir Ramin said nothing about being under an imminent and impending fear of death from anyone. Exh. G.

Indeed, as the Seventh Circuit held unequivocally in *Dunkin*, the duration of the alleged criminal activity alone defeats this proposed duress defense as a matter of law. No gun was trained on defendants continuously for over a year. No impending threat could continue that long. To the contrary, they were successful businessmen who owned restaurants, a car service, and a

---

[4] This widespread investigation, which includes charges filed against numerous U.S. military officials for receiving bribes and gratuities from these defendants, refutes any claims that such reporting would have been futile.

hotel in Brooklyn, and they easily could have deployed their resources to growing those enterprises. They could have managed the business remotely, from the safety of their Pennsylvania homes. Or they could have sought to contract elsewhere in Afghanistan, away from the conspiracy among military members and warlords that they only now allege had targeted them. As they had many times, they could have simply left the criminal environment and stayed away. Having failed to avail themselves of these easily accessible, reasonable legal alternatives over the course of more than a year, defendants cannot now interpose a defense of duress to the charged conduct.

Under the circumstances, where defendants cannot as a matter of law assert facts sufficient to show a particularized and imminent threat of death or that they exhausted reasonable legal alternatives to committing the crime, the proposed defense of duress in this case, as it was in *Dunkin*, is merely an invitation to jury nullification. Defendants should therefore be precluded from examining witnesses, adducing evidence, or tendering argument regarding such a defense. *Bailey*, 444 U.S. at 397 (affirming district court's rejection of defendants' offers of proof on duress defense and refusal to instruct jury on such a defense); *Dunkin,* 438 F.3d at 780 (holding duress defense should not be submitted to the jury if elements cannot be met); *Trapnell*, 638 F.2d at1030 (affirming district court rejection of duress defense for failure to show imminent threat); *Tokash*, 282 F.3d at 969-71 (affirming district court's refusal to hear evidence on duress where elements not met).

## CONCLUSION

For the foregoing reasons, defendants should be precluded from examining witnesses, adducing evidence, or tendering argument that duress excuses their culpability for conspiring to bribe and bribing a public official and conspiring to commit mail fraud. In connection with this Motion, the United States respectfully requests that the Court hold a pretrial evidentiary hearing, as necessary, to determine the sufficiency of defendants' duress defense as a matter of law.

DATED this 30th day of November 2010.

Respectfully submitted,

/s/ *Mark W. Pletcher*
MARK W. PLETCHER
EMILY W. ALLEN
Trial Attorneys
U.S. Department of Justice
1400 New York Ave., NW, Suite 11302
Washington, DC 20530
Telephone: (202) 307-6186

**CERTIFICATE OF SERVICE**

I hereby certify that on this 30th day of November, 2010, the foregoing MOTION IN LIMINE BY THE UNITED STATES TO PRECLUDE EVIDENCE OR ARGUMENT RELATED TO A DURESS DEFENSE was filed electronically and to the best of my knowledge, information and belief, counsel for defendants Christopher West, Patrick Boyd, Assad John Ramin, Tahir Ramin, AZ Corporation, Noor Alam, Northern Reconstruction Organization, Abdul Qudoos Bakhshi, and Naweed Bakhshi Company will be notified via ECF.

/s/ *Emily W. Allen*
Emily W. Allen
Trial Attorney, U.S. Department of Justice
1400 New York Ave, N.W., 4th Floor
Washington, D.C. 20530
Telephone: (202) 307-0946
emily.allen@usdoj.gov