# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 08 CR 669** |
| | ) | |
| **CHRISTOPHER WEST, et al.** | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

MATTHEW F. KENNELLY, District Judge:

In this decision, the Court considers five motions filed by the defendants that relate directly or indirectly to court-ordered depositions that defendants took in Afghanistan:

- Defendants' motion for ruling on admissibility of depositions and deposition exhibits (docket no. 709);

- Defendants' motion to admit delivery tickets prepared by AZ Corporation (docket no. 710);

- Defendants' motion for adverse jury instruction based on failure to preserve evidence (docket no. 711);

- Defendants' motion to admit AZ Corp.'s accounting records (docket no. 713); and

- Defendants' motion to admit Top's Construction's business license and by-laws (docket no. 715).

In addition, the Court addresses defendants' motion to compel discovery (docket no. 749).

**Background**

The defendants are charged with a variety of offenses arising from contracts the defendant entities had with the U.S. military to supply "bunkers and barriers" at Bagram Air Field (BAF) in Afghanistan. The government contends the defendants bribed U.S. military personnel to obtain the contracts and to get paid in full even though they delivered less than the full quantities for which the military had contracted. The indictment includes charges of bribery, fraud, and conspiracy.

The defendants include U.S. military personnel, contractor entites, and individuals affiliated with those entities. The U.S. military personnel defendants have pled guilty and are likely to be government witnesses at the trial or trials of the other defendants. The remaining defendants are Afghan nationals, though some of them have dual Afghan / U.S. nationality. Most if not all of the conduct underlying the indictment took place in Afghanistan.

The government conducted a ruse to lure several of the defendants, as well as several material witnesses, to travel to the United States. Once here, they were detained. The government eventually requested permission to take the depositions of the material witnesses to preserve their testimony for trial so they could return to Afghanistan. The judges who previously presided over the case adopted detailed procedures, at the government's behest, for the taking of the depositions. These included requirements for when a party had to produce documents that it proposed to use at the depositions.

Later, the defendants sought and were granted leave pursuant to Fed. R. Crim. P. 15(a)(1) to take depositions of various residents of Afghanistan. The court imposed

the same document production procedures for these depositions that it had adopted for the material witness depositions. It is undisputed that none of the persons whose depositions were taken in Afghanistan will be available to testify at trial. Each of the witnesses is beyond the Court's subpoena power and has testified that he will not attend voluntarily.

## Discussion

### 1. Defendants' motion to admit delivery tickets (docket no. 710)

Defendants seek a pretrial ruling that certain "delivery tickets" documenting the delivery of bunkers and barriers to the U.S. Army are admissible under Federal Rule of Evidence 803(6). Rule 803(6) permits its foundational requirements to be established by "certification that complies with Rule 902(11), Rule 902(12), or a statute permitting certification, unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness." Fed. R. Evid. 803(6).

A provision of Title 18, specifically, 18 U.S.C. § 3505, is a "statute permitting certification" under Rule 803(6). Section 3505 provides in pertinent part as follows:

> (a)(1) In a criminal proceeding in a court of the United States, a foreign record of regularly conducted activity, or a copy of such record, shall not be excluded as evidence by the hearsay rule if a foreign certification attests that –
>
> > (A) such record was made, at or near the time of the occurrence of the matters set forth, by (or from information transmitted by) a person with knowledge of those matters;
> >
> > (B) such record was kept in the course of a regularly conducted business activity;
> >
> > (C) the business activity made such a record as a regular practice; and

(D)     if such record is not the original, such record is a
duplicate of the original;

unless the source of information or the method or circumstances of
preparation indicate lack of trustworthiness.

(2)     A foreign certification under this section shall authenticate such
record or duplicate.

. . .

18 U.S.C. § 3505(a).

Defendants have provided a sworn affidavit by AZ's controller, an Afghan
national named Kharullah, pursuant to section 3505.  The government does not
concede the sufficiency of Kharullah's affidavit.  However, it "agrees to stipulate to [the
delivery tickets'] admissibility, conditioned on the admission of the statements by
Kharullah . . . describing the delivery tickets' creation and purpose."  Govt.'s Resp. to
Defs.' Mot. to Admit Delivery Tickets at 1 (docket no. 747).

In their reply, defendants do not oppose the admission of Kharullah's
statements.  They request, however, that the Court rule "that the delivery tickets are
admissible as evidence of receipt of the bunkers and barriers by the government."
Defs.' Reply to Govt.'s Resp. to Mot. to Admit Delivery Tickets at 2 (docket no. 755).
The government opposes this request.  It contends that the delivery tickets and
accompanying signatures are part of the defendants' scheme and are, in effect, a
series of false exculpatory statements.

Defendants' concern appears to involve the fact that each of the delivery tickets
includes a signature – by someone who, it appears, was acting on behalf of the U.S.
military – that arguably acknowledges receipt of the items listed in the delivery ticket.

4

Defendants have not, or at least have not yet, been able to identify or locate the persons who signed the tickets. For this reason, they have a legitimate concern that they may have a hard time arguing the significance of the delivery tickets to the jury.

That, however, does not permit the Court to make the sort of finding the defendants seek or to compel the government to enter into a stipulation regarding what the tickets mean. Indeed, defendants' request misapprehends what a court does when it admits evidence. When admitting evidence, a court simply finds it admissible. It does not make statements or findings regarding the import, significance, or weight of the evidence. Thus even were the Court required to address the sufficiency of Kharullah's affidavit, it would not make the sort of findings defendants request. Rather, it would simply rule the exhibits admissible.

Because the government has not objected to admission of the delivery tickets, and because both sides appear to agree to the admission of Kharullah's affidavit in evidence, the Court grants defendants' motion to admit the delivery tickets and also admits the affidavit. The Court notes that Kharullah's affidavit contains information that arguably would permit defendants to argue to the jury the inference they seek. *See* Defs.' Mot. to Admit Delivery Tickets, Ex. 2 ¶ 4. But defendants may not argue that the Court has found, or that the government has agreed, that the act of admitting the tickets in evidence has any import beyond simply finding them admissible.

**2.     Defendants' motion to compel discovery, request B1 (docket no. 749)**

In their motion to compel discovery, defendants request contact information for the persons who signed the AZ Corp. delivery tickets just discussed. *See* Defs.' Mot. to Compel Discovery at 7-8. Defendants contend that it is exceedingly unlikely that over

100 signers were in on the scheme(s) with which the defendants are charged, as arguably would have to be the case if, as the government contends, the information in the delivery tickets is false. Accordingly, defendants argue that information identifying the signers is exculpatory because it would permit them to identify and call witnesses who could establish the veracity of the information contained in the delivery tickets.

The government argues that identifying potential defense witnesses goes beyond its obligations under *Brady v. Maryland*, 373 U.S. 83 (1963), and its progeny. *See* Govt.'s Resp. to Defs.' Mot. to Compel at 10. As a general rule, *Brady* does not require the government to conduct an investigation or gather information on defendants' behalf. *See, e.g., United States v. Tadros*, 310 F.3d 999, 1005 (7th Cir. 2002). This, however, is largely a corollary of the proposition that *Brady* "does not apply to evidence not in the possession of the government that a defendant would [be] able to discover himself through reasonable diligence." *Id.*

Defendants have not requested that the government conduct an investigation on their behalf. Rather, they have simply asked the government to identify its agents (military personnel or contractors) who are in a position to provide evidence exculpatory to the defense. Defendants have sufficiently shown that this information is in the government's hands and that they are unable to obtain it on their own. Under the circumstances, the information that defendants seek falls squarely within what *Brady* requires the government to disclose. *See, e.g., United States v. Steele*, 221 F.3d 1340, 2000 WL 796191, at *4 (7th Cir. 2000) (unpublished) (finding that government's failure to make complete and timely disclosures of names and addresses of exculpatory

witness ran afoul of *Brady*, though the error was harmless).

The fact that defendants have asked the government to identify persons and not simply to provide potentially exculpatory information does not render their request improper or otherwise outside the bounds of *Brady* and its progeny. By way of example, what if, in a bank robbery case, the government were aware of an eyewitness who failed to identify the defendant as the robber when given the opportunity to do so? Surely no one would dispute that the identity of such a witness would be *Brady* material that the government must produce to the defense. *See, e.g., Goudy v. Basinger*, 604 F.3d 394, 399 (7th Cir. 2010) (agreeing with state court's determination that statements of persons who identified someone other than defendant as perpetrator were *Brady* material); *Cannon v. State of Alabama*, 558 F.2d 1211, 1215-16 & n.10 (5th Cir. 1977); *United States ex rel. Meers v. Wilkins*, 326 F.2d 135, 138 (2d Cir. 1964); *United States v. Cheshier*, 2001 WL 849346, at *2 (S.D. Ind. June 1, 2001) (Tinder, J.) (noting that government had agreed to produce, pursuant to *Brady*, information regarding any witness who had failed to identify the defendant as the perpetrator). *See also United States v. Agurs*, 427 U.S. 97, 112 n. 21 (1976) (quoting with approval the following passage from Comment, Brady v. Maryland and the Prosecutor's Duty to Disclose, 40 U. Chi. L. Rev. 112, 125 (1972): "If, for example, one of only two eyewitnesses to a crime had told the prosecutor that the defendant was definitely not its perpetrator and if this statement was not disclosed to the defense, no court would hesitate to reverse a conviction resting on the testimony of the other eyewitness.").

The information defendants seek in the present case is of like character. It is

certainly possible, as the government contends, that the information in the tickets was false and thus that the signatures by U.S. military personnel or their agents have no exculpatory significance. But on the record now before the Court, defendants' contention that this information is exculpatory is sufficiently viable to warrant a finding that the identity and location information that defendants seek is both exculpatory and material. *See, e.g., Tennison v. City and County of San Francisco*, 570 F.3d 1078, 1091 (9th Cir. 2009) (information regarding actual identity and statements of witness with exculpatory information constitutes *Brady* material); *Monroe v. Angelone*, 323 F.3d 286, 300-01 (4th Cir. 2003) (information regarding identity of witnesses with exculpatory information was *Brady* material). *Cf. Roviaro v. United States*, 353 U.S. 53, 60-61 (1957) (government must disclose identity of confidential informant if his "identity, or . . . the contents of his communications, is relevant and helpful to the defense of an accused, or is essential to a fair determination of a cause").

This does not conflict in the least with the principle that *Brady* does not require the government to conduct a defense investigation. Rather, the Court is directing the government only to provide information that it already has, specifically, the identity and location (or last known location) of the delivery ticket signers. It takes no stretch and no leap of faith to infer that anyone who signed for material on behalf of the U.S. government at a military base was either a member of the U.S. military or a contractor hired by the military. Either way, it is overwhelmingly likely the government has contact information already in its possession: in the case of a member of the military, where he or she is currently stationed if still with the military, or if no longer with the military, his address last known to the government; or in the case of an employee or agent of a

private contractor, the identity of the person and his or her employer. By contrast, the defense has no apparent way to obtain this information if left to its own devices. Unless the Court requires government to provide to the defense the identity and location information is seeks, there is a reasonable likelihood that the facially exculpatory documents the defendants have been given may be useless to them.

Even were this information not subject to disclosure under *Brady*, the Court would require the government to produce it pursuant to Federal Rule of Criminal Procedure 16(a)(1)(E), which requires the government to produce documents that are "material to preparing the defense." It is almost certainly the case that the identity and location information defendants seek is found in documents, and it is unquestionably the case that this information is material to preparation of the defense.

One final note. Though the Court orders production of this information promptly (i.e., within seven days of this order),[1] that does not mean that the start of the trial must or will be delayed until defendants actually subpoena the potential witnesses in question. Among other things, calling all of them likely would be cumulative. That aside, there are other ways in which defendants may be able to place before the jury the information they hope to gain, such as via stipulation or by offering other evidence regarding the procedures used to check in deliveries at BAF.

---

[1] The government has already had a head start on this. At oral argument on March 3, 2010, the Court advised the government that it intended to require production of the identity and location information.

**3.    Defendants' motion for ruling on the admissibility of the depositions and deposition exhibits of Aziz Rahman, Del Agha, Mohaidin, and Noor Ahmad (docket no. 709); defendants' motion to admit delivery tickets prepared by AZ Corp. (docket no. 710); defendants' motion to admit AZ Corp.'s accounting records (docket no. 713); and defendants' motion to admit Top's Construction's business license and bylaws (docket no. 715)**

The Court next considers several motions by defendants seeking to admit deposition testimony taken in Afghanistan and records used during the course of those depositions.

**a.    Background**

As noted earlier, the judge or judges who previously presided over this case established, at the government's request, detailed procedures concerning the material witness depositions. These procedures required each side to provide opposing counsel with a list of deposition exhibits one week in advance of the deposition. Later, when defendants obtained permission to take depositions of various persons in Afghanistan, the court imposed the same requirement for those depositions.

Based on the record before the Court, defendants complied with this requirement in connection with the depositions in Afghanistan. On August 20, 2010, defense counsel proposed to take depositions in Afghanistan starting on September 14, 2010. *See* Defs.' Reply to Govt.'s Opp. to Mot. to Admit (docket no. 757), Ex. 3. When the government did not respond, defense counsel proposed, on September 1, 2010, that the depositions start on September 20, 2010. *Id.*, Ex. 4. Two days later, on Friday, September 3, 2010, the government agreed to begin the depositions on September 14, 2010, the date defense counsel had originally proposed. Due to the government's delay in responding, however, the start date was just eleven days away, a period that

included a holiday weekend and travel time.

Defendants made their deposition exhibits available the next business day, September 7, 2010.  *See* Govt.'s Resp. to Defs.' Mot. to Admit, Ex. E, attached exhibit (Sept. 7, 2010 e-mail).  This was, as the court had ordered, seven days prior to the start of the depositions.  In an e-mail to the prosecutors, defense counsel said the defense would also make available unofficial translations and offered to "walk through what each document means in the larger picture."  *Id.*  Counsel did not simply leave it at that; he further explained that "several exhibits will establish through the company's books and records that it delivered the bunker and barriers in the indictment that it was paid for."  *Id.*

The depositions took place on September 14-16, 2010 in Kabul, Afghanistan. They were conducted at the compound of the International Security Assistance Force. Defendants say, and the government does not dispute, that the witnesses were examined by defense counsel for about five hours and by government counsel for a little under six hours.  *See* Defs.' Reply to Govt.'s Opp. to Mot. to Admit at 7.  During the three-day period in which the depositions were conducted, AZ Corp.'s accounting records were available for inspection at the site of the depositions, and government counsel took the opportunity to examine them.

Elections were scheduled in Afghanistan for September 18, 2010.  Defendants say, and the government does not dispute, that there had been warnings that violence would occur on the day of the election and perhaps the day before.  Defense counsel were also warned that they would be unable to leave Kabul on September 17 due to enhanced security in anticipation of the elections.  They therefore made advance

11

reservations for a flight out of Afghanistan late in the day on September 16 and advised the prosecutors of this.

The depositions were scheduled to begin at 9:00 a.m. each day. On the first day, however, the first deposition did not start until 12:00 p.m. There are conflicting accounts regarding why this happened. It is undisputed, however, that the defense had no control over the times during which they had access to the military compound where the depositions were conducted. After the first deposition began at 12:00 p..m, the government stated that defense counsel would have to leave at 3:30 p.m. This happened on ensuing days as well – even though defense counsel had (on September 1) proposed a 9:00 a.m. to 5:00 p.m. work day, *see* Defs.' Reply to Govt.'s Opp. to Mot. to Admit, Ex. 4 at 2, and the government had expressed no objection.

Defendants contend, and the government does not dispute, that they had to significantly truncate their anticipated examinations of the witnesses due to the scheduling changes they faced. The time for the government to conduct cross examination was likewise curtailed. It is undisputed, however, that the government had at least as much time to cross examine the witnesses as defendants had to conduct direct examination. And though the government contends that it was unable to complete its cross examination of one of the witnesses, Noor Ahmad, this was because the deposition took place on the date on which defense counsel had to leave the country for the aforementioned reasons. At some point late in the afternoon, defense counsel reached what amounted to a point of no return in terms of making their flight out of the country and thus were required to terminate the deposition.

**b.     Defendants' motions**

The first question concerns the admissibility of the deposition testimony.  The government says that it does not object to all of the deposition testimony but rather just the portions that concern the records defendants seek to admit.  *See* Govt.'s Resp. to Defs.' Mot. to Admit Dep. Testimony at 1.  It argues that defendants unreasonably delayed producing the records and did not comply with their obligations under Federal Rule of Criminal Procedure 16(b).  As a result, the government argues, it did not have a sufficient opportunity to examine the records or question the witnesses about them.

The Court first considers the government's Rule 16-based objection.  Discovery in criminal cases is, by rule, reciprocal.  A defendant's discovery obligations, however, are not coextensive with those imposed on the government.  There is, for example, no "reverse *Brady*" obligation imposed on defendants to produce inculpatory material.

More importantly for present purposes, the opposing sides' obligations to produce documents under Rule 16 are not equivalent.  The government is required to permit the defendant to inspect and copy records in three categories:  those "material to preparing the defense," those that the government "intends to use . . . in its case-in-chief at trial," and those that were "obtained from or belong[ ] to the defendant."  Fed. R. Crim. P. 16(a)(1)(E)(i-iii).  By contrast, a defendant is required to produce only records in the second of these categories:  those that the defendant "intends to use . . . in the defendant's case-in-chief at trial."  *Id.* 16(b)(1)(A)(ii).

The records that the defendants now seek to introduce were, to be sure, within the category of documents that Rule 16(b)(1)(A) required them to produce.  But as

defendants point out, the two sides' discovery obligations under Rule 16 differ in one additional way: a defendant's obligation to produce records under Rule 16(b)(1)(A) is triggered only upon the government's compliance with its own obligations under Rule 16(a)(1)(A). Specifically, Rule 16(b)(1)(A) imposes a disclosure obligation on a defendant "[i]f [the] defendant requests disclosure under Rule 16(a)(1)(E) *and the government complies* . . . ." Fed. R. Crim. P. 16(b)(1)(A) (emphasis added).

Defendants argue persuasively that their production of the documents in question was not untimely under Rule 16 for the very simple reason that the government had not yet complied with its disclosure obligations under Rule 16(a)(1)(E). Among other things, it is quite clear that the government was still producing, as late as December 2010 and January 2011, documents that clearly were material to preparation of the defense and thus whose production was required under Rule 16(a)(1)(E)(I) – in particular, important contract-related documents that, among other things, reflected delivery of bunkers and barriers under the relevant contracts.

Just as importantly, none of the judges who had presided over the case had set any sort of deadline for the defendants to comply with their discovery obligations under Rule 16(b) (or, for that matter, for the government to comply with its Rule 16(a) obligations). Indeed, the only deadline pertinent to the current dispute was the one-week interval the court had imposed for producing documents that a party intended to use at a deposition.

For these reasons, there is no basis for the Court to find that defendants violated any Rule-imposed or court-imposed discovery deadline or obligation in connection with their production of the records they intended to use at the depositions or that they

14

unreasonably delayed production of the records.  Rather, they complied with the only deadline any judge of this court had set.  The Court adds that it would be exceedingly unfair now to impose, retroactively, a more severe deadline than the judges who previously presided over the case had considered appropriate.  Doing this would effectively deprive the defendants of testimony that is likely quite significant to their defense, based on a new rule imposed after the fact and after it is far too late to take corrective action.

Even were this not the case, the Court is persuaded, based on the totality of the record, that the government has had an adequate opportunity to inspect the records, question the witnesses about them, and obtain countervailing evidence assuming it exists.  Among other things, the Court notes that the government has failed to articulate credibly anything more that it reasonably could have expected to obtain from the witnesses during the depositions if it had more notice of the documents defendants intended to use.  Its claim of prejudice is unsupported and speculative.[2]  The points the government has argued it wants to make regarding the records largely concern the weight to be given to them, and they are all points the government is fully able to make based on the deposition testimony and other evidence.  These arguments are not a basis to exclude the records from evidence.

Having made this determination, the Court turns to the question of the

---

[2] The government complains that it received no "reverse Jencks" material regarding the witnesses, but it has offered no basis to believe that the defense had any statements within the scope of Federal Rule of Criminal Procedure 26.2(f).  Even if the contrary were true, there is no indication that the government made a motion for production of such statements as required by Rule 26.2(a).

admissibility of the deposition testimony and the exhibits that defendants offer. Rule 15(f) provides that "[a] party may use all or part of a deposition as provided by the Federal Rules of Evidence." Fed. R. Crim. P. 15(f). Federal Rule of Evidence 804(b)(1) governs the admissibility of former testimony given by a witness who is unavailable to testify at trial. Under that rule, former testimony by an unavailable witness is not excluded by the hearsay rule if "if the party against whom the testimony is now offered . . . had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination." Fed. R. Evid. 804(b)(1). As the Advisory Committee Notes to Rule 804(b)(1) state, in determining whether to allow admission of prior testimony in a subsequent proceeding, "the question resolves itself into whether fairness allows imposing, upon the party against whom now offered, the handling of the witness of the earlier occasion." Fed. R. Evid. 804, 1972 adv. comm. notes.

The "inquiry under [Rule 804(b)(1)] focuses not on the extent of cross-examination at the former proceeding, but on whether the party's handling of the testimony was 'meaningful in light of the circumstances which prevail[ed] when the former testimony [was] offered.'" *United States v. Pizarro*, 717 F.2d 336, 349 (7th Cir. 1983) (citations omitted). The conditions under which the depositions were taken were less than ideal. Given the setting – a military compound in a country that is still at war for all practical purposes – that is not, and should not have been, a surprise. The Court is persuaded, however, that the government had a meaningful and adequate opportunity to question the witnesses and, in particular, to question them regarding the

exhibits the defendants now offer.[3]

The Court next turns to whether the defendants have laid the necessary evidentiary foundation for the records in question. As to the AZ Corp. accounting records, the testimony of Noor Ahmad provides the necessary foundation for admissibility under Rule 803(6). Specifically, he testified that he had personal knowledge that the accounting records were made and kept in the ordinary course of AZ's regularly conducted business activity. There is no basis to conclude that "the source of information or the method or circumstances of preparation indicate lack of trustworthiness." Fed. R. Evid. 803(6). Contrary to the government's suggestion, there is no such thing as a rule, or even a presumption, that records prepared by a defendant fail Rule 803(6)'s trustworthiness test. *United States v. Spano*, 421 F.3d 599, 604 (7th Cir. 2005), which the government cites, simply states that Rules 803(6) and 803(8) do not allow documents to be admitted under those exceptions to the hearsay rule if the circumstances of their preparation indicate a lack of trustworthiness. And *Kikalos v. United States*, 408 F.3d 900, 904 (7th Cir. 2005), which the government also cites, simply says that if the record keeper is a person with a strong motive to falsify, a court *may* deem his records to unreliable as to be inadmissible. In other words, neither of

---

[3] The government's objection that it has been taken by surprise because defense counsel did not "offer" the exhibits at the depositions is rather strained, to be charitable about it. First, the government cites no rule, and the Court is aware of none, that required defense counsel to perform this formality at the deposition itself, where there was no judicial officer present to rule on admissibility. Second, and more importantly, it ought to have been patently obvious to any reasonable attorney that defense counsel were questioning the witnesses about the documents and laying the foundation for those documents because they intended to offer them in evidence. The prosecutors offer no plausible alternative explanation for what they thought defense counsel were doing.

these cases imposes some sort of tougher Rule 803(6) standard for documents prepared by a corporate defendant like AZ Corp.

To the extent those cases or others suggest that enhanced scrutiny of business records is required in this situation, the Court has exercised it. Ahmad, an employee of AZ Corp., may have a motive to falsity, but the evidence regarding the preparation of the accounting records does not indicate untrustworthiness such that the Court should exclude the records and prevent the jury from considering them. The government's arguments may suggest that the jury should not give the records significant weight because of what they do and do not contain, but that is an issue appropriately left to the jury. The Court is confident that the jury will have sufficient evidence to allow both sides to argue, fully and fairly, the appropriate weight to be given to the accounting records.

The Court likewise concludes that the government had a meaningful and adequate opportunity to cross-examine Aziz Rahman regarding the Top's Construction business license and bylaws. Whether those records are admissible is a separate question. The Court deals first with the business license. Defendants have not authenticated the license under Federal Rule of Evidence 902(3), because they offer no certification from a responsible official of the agency of the Afghanistan government that issued the license, and they have failed to show "good cause" under that Rule for dispensing with that requirement. Thus the record is not admissible under Rule 803(8) as a public record. Defendants also offer it as a business record of Top's Construction pursuant to Rule 803(6). The Court is unpersuaded. The license is not a record of regularly conducted activity *of Top's Construction* and is thus not admissible via Rahman's foundational testimony. In addition, Rahman is not a "qualified witness" who

can testify regarding the regularly conducted activities of the government licensing agency.[4]

Rahman's testimony is, however, sufficient to lay the foundation for the admission of Top's Construction's by-laws under Rule 803(6) as a record of the regularly conducted activity of that entity.  That record is therefore admissible.

**4.      Defendants' motion for an adverse jury instruction (docket no. 711)**

Defendants contend that the government has failed to preserve and produce documents related to the contracts at issue in this case.  They request that the Court rule that it will instruct the jury at trial that the missing documents were favorable to the defense.

The government responds that it has produced every contract document "in the files of the prosecution team" and has also sought additional contract records from agencies within the U.S. Department of Defense, including the contracting office at BAF, the Defense Financial Accounting Service (DFAS), the Contract Closeout Task Force, and other locations.  *See* Govt.'s Resp. to Defs.' Mot. for Adverse Jury Instruction at 1.  Anticipating this argument, defendants offer an affidavit from Jarad Kriz, who has extensive experience in government contracting.  Kriz identifies particular types of documents that customarily would have been created or received by government officials in similar circumstances but that are missing from the files the government has produced in this case.  *See* Defs.' Mot. for Adverse Jury Instruction, Ex. 7.  The government suggests that Kriz does not know what he is talking about.  It

---

[4] Rahman's deposition testimony about obtaining business licenses for Top's Construction is admissible, however.

also notes that it has since located and produced additional records, *see* Govt.'s Resp. to Defs.' Mot. for Adverse Jury Instruction at 6 n.3, and it indicates that at least some of what Kriz references actually has been produced.  The bottom line, the government argues, is that no evidence, and certainly no evidence that might be beneficial to the defense, is missing.

A negative inference is justified if the government destroyed or failed to preserve "apparently exculpatory" evidence, even if the government did not act deliberately or knowingly.  *Arizona v. Youngblood*, 488 U.S. 51, 57-58 (1988).  If, however, the evidence is only "potentially useful," a negative inference is not justified unless the defendant shows that the government acted in bad faith.  *Id.*  As the Supreme Court stated in *Youngblood*,

> [t]he Due Process Clause of the Fourteenth Amendment, as interpreted in Brady, makes the good or bad faith of the State irrelevant when the State fails to disclose to the defendant material exculpatory evidence.  But we think the Due Process Clause requires a different result when we deal with the failure of the State to preserve evidentiary material of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant.

*Id.* at 57.  The same test applies to the government in federal prosecutions.  *See, e.g., United States v. Kimoto*, 588 F.3d 464, 474-75 (7th Cir. 2009) (applying the *Youngblood* standard in a federal case).

Assuming for purposes of argument that information is in fact missing from the contract records, defendants have not shown that it was "potentially exculpatory."  Their arguments to the contrary are conclusory and unsupported.  In addition, defendants have made no attempt to show that the government acted in bad faith in failing to

preserve the allegedly missing information.  For these reasons, the Court denies defendants' motion for an adverse jury instruction.

In their reply brief, defendants note that the government produced over 2,100 documents to the defense on December 30, 2010 and January 14, 2011, most of which are contract-related and some of which, defendants contend, are exculpatory.  They contend that the government unduly delayed producing exculpatory evidence and that this, too, warrants an adverse jury instruction.  *See* Defs.' Reply to Govt.'s Opp. to Mot. for Adverse Jury Instruction at 6-7.  Defendants further argue that the late production of these documents deprived them of the opportunity to question two of the Afghan deposition witnesses regarding these documents.

The documents in question are U.S. government records.  When questioned at oral argument regarding how the defense would have used the records at the deposition, defense counsel said he would have used them in conjunction with AZ Corp.'s records to show they corresponded and tended to show that AZ had delivered all of the bunkers and barriers it contracted to provide.  But counsel conceded that the two Afghan witnesses had never seen the U.S. government documents.  As a result, the witnesses would not have been able to testify regarding the contents of the U.S. government records, and any testimony almost certainly would have been inadmissible.

All of this aside, defendants have failed to show that they have been prejudiced by the late production.  Assuming the government records are in fact exculpatory or otherwise corroborative of AZ's records, defendants still have the opportunity to attempt to introduce them at trial.  And the Court sees no apparent reason why the defendants will be unable to explain the documents' significance vis-a-vis AZ's records, via a

summary witness or otherwise.  In short, defendants have failed to show that the recently-produced records were produced too late for defendants to make effective use of them at trial, which is all *Brady* and its progeny requires.  *See, e.g., Bielanski v. County of Kane*, 550 F.3d 632, 645 (7th Cir. 2008) ("Even late disclosure does not constitute a *Brady* violation unless the defendant is unable to make effective use of the evidence.").  In short, defendants' argument that they have been prejudiced is unsupported.

For these reasons, the Court denies defendants' motion for an adverse jury instruction.

## 5. Defendants' motion to compel discovery (docket no. 749)

Finally, the Court deals briefly with the other points argued in defendants' motion to compel discovery.

First, the Court declines defendants' request for a spoliation hearing in connection with the government's production of contract record.  Defendants have offered no basis whatsoever for their contention that documents were altered or destroyed by the government or were produced in an inappropriate manner.  If defendants still wish to examine the original records, the government must make them available promptly, under reasonable terms and conditions, in the manner in which they were maintained by the agencies in question.[5]  If defendants wish to copy the records again, however, they must do so at their own expense.

---

[5] The terms and conditions that defendants described in the motion under which they were able to review the records a few boxes at a time do not meet this standard of reasonableness.

Second, the Court has considered earlier in this decision defendants' arguments regarding production of contact information for persons who signed the delivery tickets on the government's behalf and the purported delay in the production of *Brady* material. The Court thus need not deal with these points again.

Third, it is relatively obvious that if, as defendants say, defendant West initially attempted to minimize his knowledge of the scheme, that would constitute material the government must produce pursuant to *Giglio v. United States*, 405 US. 150 (1972), pursuant to the schedule previously set. The same is true of information regarding any drug usage by West. In addition, any communications between the government and its witnesses that amount to or contain *Giglio* material or Jencks Act materials are to be produced pursuant to the schedule previously set.

Fourth, defendants say the government contended on earlier occasions that West received $240,000 in bribes but that he admitted only to a smaller amount in his guilty plea. If the government has information that West received more by way of bribe money than he admitted in his plea agreement, this likely constitutes *Giglio* material, as it may suggest that West received a benefit as part of his plea deal. Any such information must be produced pursuant to the schedule previously set for production of *Giglio* material.

Fifth, the Court agrees with the government that documents from Army Criminal Investigation Division files that the government has withheld from production constitute work product that the government is not required to produce in discovery, *see* Fed. R. Crim. P. 16(a)(2), except to the extent these documents contain *Brady* or *Giglio* material

that the government has not otherwise produced.

Sixth, the government represented at oral argument that it does not intend to offer in evidence any e-mails that it obtained from certain Internet service providers via the Stored Communications Act. This renders moot defendants' request for production of the submissions the government made to obtain court orders for production of these e-mails. The Court is also satisfied with the government's response to defendants' request for production of search warrants and affidavits. *See* Govt.'s Resp. to Defs.' Mot. to Compel at 10.

Finally, the government represented at oral argument that it has now produced the privilege log that defendants sought. Issues regarding the log's sufficiency, if there are any, are not covered by the motion to compel.

## Conclusion

For the reasons stated above, the Court grants defendants' motions for ruling on admissibility, to admit delivery tickets, and to admit AZ Corp.'s accounting records [# 709, 710 & 713]; denies their motion for adverse jury instruction [# 713]; and grants in part and denies in part their motions to admit Top's Construction records and to compel discovery [# 715 & 749].

MATTHEW F. KENNELLY
United States District Judge

Date: March 8, 2011