# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Case No. 08 CR 669 |
| ) | |
| CHRISTOPHER WEST, et al., ) | |
| ) | |
| Defendants. ) | |

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

The defendants in this case are charged with a variety of offenses arising from contracts the defendant entities had with the U.S. military to supply "bunkers and barriers" at Bagram Air Field (BAF) in Afghanistan. The government contends the defendants bribed U.S. military personnel to obtain the contracts and to get paid in full even though they delivered less than the full quantities for which the military had contracted. The indictment includes charges of bribery, fraud, and conspiracy.

The defendants include U.S. military personnel, contractor entities, and individuals affiliated with those entities. The U.S. military personnel defendants have pled guilty and are likely to be government witnesses at the trial or trials of the other defendants. There are three groups of defendants going to trial: AZ Corporation ("AZ") and two of its principals, John Ramin and Tahir Ramin; Northern Reconstruction Organization ("NRO") and its owner Noor Alam; and Naweed Bakhshi Company ("NBC") and its owner Abdul Qudoos Bakhshi.

In 2005, Tahir Ramin ("Tahir") gave a statement to an agent of the Army Criminal Investigation Division (CID) in Afghanistan. In August 2008, the government used a ruse to lure him and other defendants and material witnesses to come to the United States and then detained them after they arrived. Tahir gave another statement to government agents while he was detained.

The government seeks to introduce portions of Tahir's statements. It has redacted the statements in an effort to meet the requirements of *Bruton v. United States*, 391 U.S.123 (1968), and its progeny. AZ and John argue that the redactions do not adequately protect their right of confrontation under the Sixth Amendment. They move to bar admission of the redacted statement or alternatively for a severance from Tahir.

For the reasons stated below, the Court concludes that if the government introduces the redacted version of Tahir's statement, AZ and John are entitled to be tried separately.

**Background**

Tahir and John are brothers and majority owners of AZ, a defense contractor that operates in Kabul, Afghanistan. Prior to their indictment in August 2008, they were suspects in a federal investigation into alleged bribery and fraud arising out of contracts with the United States Army relating to its operations at Bagram Air Field ("BAF"). On or about July 25, 2005, CID agent John Fields interviewed Tahir at BAF. According to Fields's investigation report, Tahir stated that he had been approached by Major Christopher West and Lieutenant Robert Moore about participating in a bribery scheme. Tahir said that West and Moore told him they would falsify delivery records so that AZ

2

would be paid for equipment that it never actually delivered to BAF.  Tahir denied participating in the proposed scheme and offered to provide CID with records of AZ's BAF-related contracts.

Three years later, on August 25, 2008, federal agents detained Tahir at O'Hare Airport after he arrived on a flight from Afghanistan.  After being advised of his rights, Tahir spoke with the agents about AZ's military contracting activities in Afghanistan.  According to handwritten notes taken by Defense Criminal Investigative Service agent Gary DeMartino, Tahir again provided details of the bribery scheme involving West and Moore.  This time, however, Tahir said that AZ participated in the scheme by paying bribes to West and Moore.  He also stated that John was the person at AZ who was responsible for paying the bribes.  Tahir's 2008 statement thus incriminated both AZ and John.

The interviewing agents memorialized Tahir's 2005 and 2008 statements in a series of typewritten reports.  The government seeks to admit the contents of these reports against Tahir.  However, because the reports contain information incriminating John and AZ, the government redacted the reports to replace all references to John and AZ with pronouns—respectively, "an individual" and "a company."  The government offers the proposed redactions to show how an agent would testify at trial regarding Tahir's statements.  The AZ defendants argue that even with the redactions, Tahir's statements obviously refer to John and AZ and therefore are inadmissible at a joint trial.

## Discussion

The Confrontation Clause of the Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses

3

against him." U.S. Const. amend. VI. The admission of a non-testifying criminal defendant's confession against his or her co-defendant at a joint trial violates the Confrontation Clause. *See Bruton,* 391 U.S. at 126. This rule is not violated, however, if the government "replaces co-defendant names with neutral pronouns such that there is no obvious reference to the co-defendants" and the court instructs the jury that it can consider the confession only against the defendant who gave it. *United States v. Sutton*, 337 F.3d 792, 799 (7th Cir. 2003) (citing *Gray v. Maryland*, 523 U.S. 185, 196 (1998)). In determining whether a statement refers to a co-defendant so obviously that the statement's admission at trial would violate the Confrontation Clause, the Seventh Circuit considers whether the redactions create a "one-to-one correspondence between the inserted terms and the co-defendants at issue." *United States v. Hernandez*, 330 F.3d 964, 973 (7th Cir. 2003); *see also Sutton*, 337 F.3d at 799-800; *United States v. Hoover*, 246 F.3d 1054, 1059 (7th Cir. 2001).

The Court concludes that the redacted statement, if admitted at a joint trial, would violate John and AZ's rights under the Confrontation Clause. The redactions hide these defendants' names, but one can easily determine their identities with only a cursory understanding of the case. The following passages are illustrative (the substituted references are in all-capitals and bold type):

> West and Moore approached T. Ramin about a corruption scheme concerning the "bunkers and barriers" contract. The scheme was that **A COMPANY** would pay Moore and West an agreed upon amount of money. In turn, **THAT COMPANY** would not have to deliver a set amount of "bunkers or barriers" but Moore and West would make it look like **THAT COMPANY** fulfilled their end of the order. All of the BAF contractors knew about the scheme as it was common knowledge. Several other companies were awarded the bunkers and barriers contract. . . .

4

Since wire transfers were new in Afghanistan, West and Moore were paid their bribery money in cash. **AN INDIVIDUAL** was responsible for paying West and Moore the pay off money in cash. For example: A call sheet sent out by the contracting officer said they need 500 barriers. **A COMPANY** would deliver 500 barriers as requested but first would have to pay West and Moore whatever they asked prior to getting paid by the military. . . . West asked for bribes ranging from $5.00 [sic] to $20,000.00 dollars. . . .

. . .

At one point, Charles Finch (Finch) replaced Major Rogers as the contracting offer. At the time, the line haul contract was up for renewal. Adjumal (NFI), the son of Bubba John (NFI) who was a known warlord, paid Finch $50,000 to get rid of **A COMPANY** and make sure they were "kicked out" of the line haul contract. Also for the money, Finch brought two new companies, AIT (NFI) and ATT (NFI) into the line haul contract. Finch had to explain to his chain of command why he awarded AIT and ATT the contract so, he fabricated a story claiming **THE FIRST COMPANY** could not provide the services outlined in the contract. This was an inaccurate [sic] because **THE FIRST COMPANY** could provide the services outlined in the contract. **THE FIRST COMPANY** has the necessary freezers to meet the line haul contract obligations and AIT and ATT did not. At one point, AIT and ATT came to **AN INDIVIDUAL** and tried to sub-contract for the line haul contract. **THE INDIVIDUAL** refused to sub-contract with the companies which resulted in both T. Ramin and **THE INDIVIDUAL** receiving death-threats. Because AIT and ATT could not provide the services, Finch came to **THE COMPANY** and wanted them back in the contract. Finch told **THE INDIVIDUAL** that if they wanted back in the line haul contract, it would cost them $50,000.00. T. Ramin was not present when this conversation took place. **THE INDIVIDUAL** instructed T. Ramin to send Finch the $50,000.00 so they could get back into the line haul contract. . . .

T. Ramin just wanted a "fair playing ground" however; it has not been fair since he has been there. Every contracting officer assigned to BAF seems to want a kick back / bribe for contracts and orders. He claimed it was like the "wild, wild west." A few honest companies would not pay the contracting officer a kick back. Those companies no longer have contracts.

Govt.'s Resp. to Defs.' Mots. and Objs. Relating to Tahir Ramin's Interview Statements,

Ex. A, attachment 2.

It will be patently obvious to any jury hearing these statements in a joint trial that the references to the "COMPANY" mean AZ and that the references to the "INDIVIDUAL" mean John Ramin. Perhaps the most facially apparent is the third quoted paragraph, via which the jury will be told that the company that had the line haul contract came to "an individual" to enter into a subcontract but "the individual" refused; Finch wanted "the company" back into the contract and told "the individual" this would cost $50,000; and "the individual" then told T. Ramin to send Finch the $50,000. The Court cannot imagine how any reasonable juror could understand "the company" in this vignette to be anything other than AZ and "the individual" to be anyone other than AZ's other principal, John Ramin. These and other statements, which repeatedly link the "individual" and the "company" with Tahir, create a one-to-one correspondence with Tahir's brother and business partner, John, and their shared business venture, AZ.

The government, relying heavily on *United States v. Stockheimer*, 157 F.3d 1082 (7th Cir. 1998), argues that the redacted statements do not run afoul of *Bruton* because they incriminate John and AZ only inferentially. But the Seventh Circuit expressly rejected this understanding of *Stockheimer* in *Hoover*, explaining that

> the proposition that replacing a name with a pseudonym is proper unless the identity of the alias can be deduced within the four corners of the confession is incompatible with *Gray*, and we do not read the opinion in *Stockheimer* to adopt what was, after all, the main argument of the dissenting opinion in *Gray*. . . . *To adopt a four-corners rule would be to undo* Bruton *in practical effect*.

246 F.3d at 1059 (emphasis added). The Supreme Court in *Gray* likewise recognized that a redacted statement may violate *Bruton* even if it is incriminating only by inference. *Gray*, 523 U.S. at 195 ("We also concede that the jury must use inference to

6

connect the statement in this redacted confession with the defendant. But inference pure and simple cannot make the critical difference . . . ."); *see also id.* at 196 ("The inferences at issue here involve statements that, despite redaction, obviously refer directly to someone, often obviously the defendant, and which involve inferences that a jury ordinarily could make immediately, even were the confession the very first item introduced at trial.").

Accordingly, a court does not consider a redacted statement in isolation. Rather, it can and should consider the surrounding circumstances in determining whether the redacted statement impermissibly identifies a non-testifying co-defendant. In this case, as in *Gray*, a juror exposed to the redacted statements at a joint trial would quickly understand the substituted phrases to identify John and AZ. This would be the case even were the statements were the first item of evidence introduced at trial. By that point, both sides will have framed the case in their opening statements. It would be hard to imagine a juror, having heard opening statements and having seen Tahir and John sitting at counsel table along with counsel for AZ, to understand the supposedly neutral references to identify anyone other than John and AZ.

The government also relies upon *Sutton*, in which the Seventh Circuit found that a redacted statement that used substitutions similar to those proposed here, such as "an individual," did not run afoul of the Confrontation Clause. *Sutton*, 337 F.3d at 799. But the court in *Sutton* did not hold that a generic replacement term such as "an individual" always cures a potential *Bruton* problem. Rather, it found that, unlike in *Hoover*, where the substitutions were "the equivalent of a nickname," the co-defendants

7

in *Sutton* would be incriminated only if the jury "pursue[d] an extended inferential chain of reasoning" involving five separate inferences. *Id.* at 799, 800. In this case, by contrast, the ties between John, Tahir, and AZ are immediately apparent. No inferential chain is needed; indeed, it is provided to some extent by the context of the redacted statement itself.

In the Court's view, this case is analogous to *United States v. Bouzanis*, No. 00 CR 1065, 2003 WL 22143278 (N.D. Ill. Sept. 16, 2003) (Lefkow, J.). In that case, a grand jury indicted four individuals and a dissolved corporation for various crimes. At a joint trial of three of the defendants, the government sought to introduce a statement from one of the non-testifying defendants that contained references to a co-defendant. The government redacted this co-defendant's name and replaced it with "individual A." *Id.* at *5. The court found this redaction insufficient under *Bruton* and distinguished *Sutton*:

> In *Sutton*, the court held that the substitution of the words 'another individual' for the defendant's name did not create an improper identification. However, the Court's decision in *Sutton* was based on the fact that there were numerous people involved in the various crimes described in the redacted statement. . . .
>
> The Indictment here, however, does not involve a great number of people. Based on the proposed redacted statement, the jury could easily identify 'Individual A' as George Palivos.

*Id.* at *5-6 (citation omitted). In short, the court concluded that the statement ran afoul of *Bruton* even with a generic replacement term, because it obviously referred to a defendant on trial due to the small number of actors involved.

Similarly, the superseding indictment in this case identifies only a small number

8

of individual defendants other than the alleged bribe-takers. Specifically, it refers only to the two Ramins and the other two individual defendants who are going to trial – who, the Court notes, now likely will be tried separately due to the government's withdrawal of its prior opposition to severance requests. As in *Bouzanis*, the replacement of John's name with "an individual" does not eliminate the obvious reference to him. Even more plainly, the use of the term "the company" is an obvious reference to AZ, given the context of the statement and the way in which it closely associates Tahir with "the company."

For these reasons, the government's proposed redacted statements "so closely resemble[s] *Bruton*'s unredacted statements" that they cannot be presented at a trial that includes John Ramin and AZ Corporation without infringing their Sixth Amendment confrontation rights. *Gray*, 523 U.S. at 192.

## Conclusion

For the reasons stated above, if the government intends to offer the redacted statements by Tahir Ramin that it has provided to the Court, John Ramin and AZ Corporation are entitled to be tried separately from Tahir Ramin.

 _____
 MATTHEW F. KENNELLY
 United States District Judge

Date: March 10, 2011